**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

ATTORNEY'S PROCESS AND
INVESTIGATION SERVICES, INC.,

Plaintiff,

vs.

SAC & FOX TRIBE OF THE
MISSISSIPPI IN IOWA,

Defendant.

No. 05-CV-168-LRR

**ORDER**

---

## *TABLE OF CONTENTS*

*I.*   *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*  *RELEVANT PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . **2**
    *A.*   *Intra-Tribal Governmental Dispute* . . . . . . . . . . . . . . . . . . **2**
    *B.*   *Tribal Court Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
    *C.*   *Federal District Court Complaint* . . . . . . . . . . . . . . . . . . **4**
    *D.*   *Tribal Court Considers Jurisdiction Issue* . . . . . . . . . . . . . . **4**
    *E.*   *API Appeals Tribal Court Decision to Federal District Court* . . . . . **4**

*III.* *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . **5**
    *A.*   *Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    *B.*   *Casino* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    *C.*   *Dispute* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    *D.*   *Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
    *E.*   *Bear Council's Communications with Federal Agencies* . . . . . . . . **7**
    *F.*   *API Raids the Casino* . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

*IV.*  *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
    *A.*   *Parties' Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
    *B.*   *Subject Matter Jurisdiction and Sovereign Immunity* . . . . . . . . . . **9**
    *C.*   *Subject Matter Jurisdiction* . . . . . . . . . . . . . . . . . . . . . . **10**
        *1.*   *Count I: request for declaratory judgment* . . . . . . . . . . . . **10**
        *2.*   *Count II: breach of contract* . . . . . . . . . . . . . . . . . . . **10**
    *D.*   *Sovereign Immunity* . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
        *1.*   *Count I: request for declaratory judgment* . . . . . . . . . . . . **11**

      2.     *Count II: breach of contract* . . . . . . . . . . . . . . . . . . . . . . **13**

  E.   **Tribal Court's Jurisdiction Over API** . . . . . . . . . . . . . . . . . . . . . **15**

      *1.*     *Protective prong* . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

           *i.*     *Political integrity* . . . . . . . . . . . . . . . . . . . . . . . . **18**

           *ii.*    *Economic security* . . . . . . . . . . . . . . . . . . . . . . **18**

           *iii.*   *Cases applying protective prong* . . . . . . . . . . . . . . **19**

      *2.*     *Consent prong* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

      *3.*     *Miscellaneous arguments* . . . . . . . . . . . . . . . . . . . . . . . **21**

           *i.*     *Section 83.2* . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

           *ii.*    *Arbitration clause* . . . . . . . . . . . . . . . . . . . . . . **22**

**V.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

## I. INTRODUCTION

The matters before the court are the "Motion to Dismiss" (docket no. 48), filed by Defendant Sac & Fox Tribe of the Mississippi in Iowa ("Tribe"), and the "Motion for Partial Summary Judgment on Jurisdictional Grounds" (docket no. 63) ("Summary Judgment Motion"), filed by Plaintiff Attorney's Process and Investigation Services, Inc. ("API").

## II. RELEVANT PROCEDURAL BACKGROUND

### A. Intra-Tribal Governmental Dispute [1]

In 2002, Alex Walker, Jr. was the leader of the seven-member elected council that governs the Tribe. On September 26, 2002, some Tribe members became dissatisfied with

---

[1] The court's recitation of the facts is drawn from the record before the court and the Tribal Court's record. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 21 (1987) ("'[T]he orderly administration of justice in the federal court will be served by allowing a full record to be developed in the tribal court before either the merits or any question concerning appropriate relief is addressed.'") (quoting *Nat'l Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 856 (1985)). The court also notes the parties do not dispute the material facts at issue in this case—only their legal implication. *See* Brief in Support of Summary Judgment Motion (docket no. 63-5), at 3 (discussing Tribal Court of Appeals's factual findings).

this "Walker Council" and submitted recall petitions for its members.

On October 10, 2002, the Walker Council purported to accept the recall petitions. However, the Walker Council never set recall elections. On March 4, 2003, the Walker Council rejected the recall petitions.

Also on March 4, 2003, the Tribe's Hereditary Chief Old Bear appointed an interim tribal council. The "Bear Council" consisted of Hereditary Chief Old Bear and six other Tribe members.

On March 26, 2003, Hereditary Chief Old Bear administered oaths of office to the Bear Council.[2] On April 14, 2003, some members of the Tribe signed a declaration of support for Hereditary Chief Old Bear's actions. These same Tribe members also agreed that none of the members of the Walker Council were qualified to serve on the Tribe's council.

On May 22, 2003, the Tribe held a special election to resolve the intra-tribal dispute. The Tribe elected all seven members of the Bear Council. In the fall of 2003,[3] the Tribe held another election and confirmed the Bear Council in its entirety.

### B.  Tribal Court Complaint

On August 3, 2005, the Bear Council filed a tort action on behalf of the Tribe in the Court of the Sac & Fox Tribe of the Mississippi in Iowa ("Tribal Court"). *See Sac & Fox Tribe of the Miss. in Iowa v. API*, No. API-CV-Damages-2005-01 (Court of the Sac & Fox Tribe of the Mississippi in Iowa). The Tribe alleged trespass to land, trespass to chattel, theft of tribal funds and misappropriation of trade secrets.

---

[2] On April 8, 2003, the Walker Council filed a declaratory judgment suit in this court against the Bear Council. The Walker Council asked this court to determine which council was authorized to govern the Tribe. The court dismissed the suit for lack of subject matter jurisdiction. *Sac & Fox Tribe of the Miss. in Iowa v. Bear*, 258 F. Supp. 2d 938 (N.D. Iowa 2003) (Reade, C.J.), *aff'd*, 439 F.3d 832 (8th Cir. 2006).

[3] The date of the fall 2003 election is unclear from the record.

On September 23, 2005, API filed a motion in the Tribal Court. API asked the Tribal Court to dismiss the Tribe's complaint, claiming the Tribal Court lacked subject matter jurisdiction over API.

### C. Federal District Court Complaint

On October 21, 2005, API filed a Complaint (docket no. 2) in this court. The Complaint alleges the Tribe, acting under the leadership of the Bear Council, breached a contract and asks the court to bar the Tribe's lawsuit in the Tribal Court. Additionally, API asks the court to compel arbitration.

On November 15, 2005, the court entered an Order (docket no. 24). The court stayed the instant action pending exhaustion of remedies in the Tribal Court.

### D. Tribal Court Considers Jurisdiction Issue

On March 26, 2008, the Tribal Court entered an order ("Tribal Court Order") (docket no. 48-5, Ex. 7) in which it denied API's motion to dismiss. The Tribal Court concluded it could exercise civil jurisdiction over API.

On December 23, 2008, the Appellate Court of the Sac & Fox Tribe of the Mississippi in Iowa ("Tribal Court of Appeals") affirmed the Tribal Court. Tribal Court of Appeals Order (docket no. 48-5, Ex. 8).

On January 20, 2009, the Tribal Court stayed its proceedings pending this court's resolution of issues related to the Tribal Court's exercise of civil jurisdiction over API.

### E. API Appeals Tribal Court Decision to Federal District Court

On January 2, 2009, API filed a Motion to Reopen (docket no. 37) in the instant action. On January 7, 2009, the court granted the Motion to Reopen (docket no. 41) and lifted its stay.

On January 27, 2009, the Tribe filed an Answer (docket no. 49) in which it denies the substance of the Complaint and alleges that the court lacks subject matter jurisdiction over this action. That same date, the Tribe filed its Motion to Dismiss.

On March 1, 2009, API filed the Summary Judgment Motion. The Summary Judgment Motion also contains a resistance to the Motion to Dismiss. On March 11, 2009, the Tribe filed a Reply (docket no. 69) in support of its Motion to Dismiss. On April 2, 2009, the Tribe filed a Resistance (docket no. 74) to the Summary Judgment Motion. On April 13, 2009, API filed a Reply (docket no. 77-2) in support of its Summary Judgment Motion. On May 8, 2009, the Tribe filed a corrected version of its Resistance to the Summary Judgment Motion (docket no. 86).

API requests oral argument on the Motion to Dismiss and the Summary Judgment Motion (together, "Motions"). The court finds oral argument is not necessary. The Motions are fully submitted and ready for decision.

### III. RELEVANT FACTUAL BACKGROUND

#### A. Parties

API is a security services corporation with its principal place of business in Wisconsin. The Tribe is a federally recognized Indian Tribe whose members live on the Meskwaki Settlement ("Settlement") in Tama County, Iowa. The Tribe owns the Meskwaki Bingo•Casino•Hotel ("Casino") under a state-tribal compact with the State of Iowa. *See In re Sac & Fox Tribe of the Miss. of Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 751 (8th Cir. 2003).

#### B. Casino

The Casino is the Tribe's "economic engine" and is located on the Settlement. Tribal Court of Appeals Order at 16. The National Indian Gaming Commission ("NIGC") regulates the Casino.

#### C. Dispute

From September 2002 through the fall of 2003, the Tribe was embroiled in the intra-tribal governmental dispute discussed above. The Bear Council ultimately prevailed over the Walker Council. The Bear Council has retained control of the Tribe's

government and the Casino during the pendency of the instant action.

## D. Agreement

In June of 2003, after the Bear Council had been elected in the May 2003 elections, the Walker Council continued to try to do business on behalf of the Tribe. On June 16, 2003, the Walker Council purported to enter into an agreement with API on behalf of the Tribe ("Agreement") (docket no. 2-2, Ex. A). The Agreement purported to engage API on behalf of the Tribe for "investigation, security and law enforcement consulting services[.]" Agreement at 1. More specifically, the Agreement stated API would "perform services directly relating to the investigation of a takeover by dissidents at the [Casino]," investigate "individuals involved in the unlawful acts against the Tribal Government" and "[i]nvestigate allegations of unlawful acts and tribal policy violations of the dissident group involving Tribal funds[] and gaming operations." *Id.* at 1-2.

The Agreement contained an arbitration clause. The arbitration clause states, in relevant part:

> i. The parties shall make efforts to settle through dialogue and negotiation any disputes that may arise out of this Agreement. However, should such efforts fail after thirty (30) days, the dispute shall be submitted to arbitration, which shall be conducted in Des Moines, Iowa, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be heard before one arbitrator chosen by consensus of the parties. If the parties cannot mutually agree on an arbitrator, the arbitrator shall be chosen in accordance with the Rules of the American Arbitration Association. The decision of the arbitrator shall be final and binding upon the parties.
>
> ii. [. . .] Judgment on the award of the arbitrator may be entered by the Federal District Court for the Northern District of Iowa under the Federal Arbitration Act or [an] Iowa state court pursuant to Iowa law. For this purpose, the Tribe and API hereby irrevocably consent to the jurisdiction over their

persons of such courts for such purpose, including to enter judgment on an arbitration award, and waive any defense based on improper venue, inconvenient venue, or lack of personal jurisdiction.

iii. The failure of any party to submit voluntarily to arbitration shall be deemed to be a breach of this Agreement. Provided, that if either party has a good faith position that a dispute does not arise under this Agreement, that party may file an action in the Federal District Court for the Northern District of Iowa, or the Iowa state courts, to determine whether the dispute is the proper subject of arbitration under this Agreement.

*Id.* at 5.

At the time API executed the Agreement, it was under the impression that the Walker Council was the Tribe's true governing body. However, API was incorrect. On March 26, 2008, the Tribal Court held the Walker Council had no authority to enter into the Agreement on behalf of the Tribe because the Bear Council had exclusive governing power over the Tribe at the time the Agreement was executed. The Tribal Court held that, consequently, the Agreement was invalid and unenforceable against the Tribe. This decision was affirmed by the Tribal Court of Appeals.

### E. Bear Council's Communications with Federal Agencies

Hereditary Chief Old Bear and others communicated with various federal agencies regarding the newly installed Bear Council. However, these federal agencies refused to recognize the Bear Council for purposes of gaming activities and other federal matters until after the second election in the fall of 2003. For instance, on March 17, 2003, Hereditary Chief Old Bear received a letter from the United States Department of the Interior Bureau of Indian Affairs ("BIA") in which the BIA stated it could not involve itself in the dispute over whether the Walker Council or Bear Council was the Tribe's true governing council. In this letter, the BIA also indicated that it recognized the Walker Council as the Tribe's governing body. On April 1, 2003, Hereditary Chief Old Bear received a letter from the

United States Department of the Interior Office of the Secretary ("Secretary") in which the Secretary stated it continued to recognize the Walker Council as the Tribe's official leadership. On May 9, 2003, Hereditary Chief Old Bear received a letter from the BIA stating it continued to recognize the Walker Council as the governing Tribal authority. On May 23, 2003, Hereditary Chief Old Bear received a letter from the Secretary stating that, because the May 22, 2003 election had not been held in accordance with tribal law, the Department would not recognize the results of that election.

### F. API Raids the Casino

On October 1, 2003, API raided the Casino pursuant to the Agreement with the Walker Council and without authority from the Bear Council. At the time of the raid, the Bear Council had governing control over the Casino. Approximately thirty individuals associated with API stormed the Casino. Many were armed with batons. At least one individual affiliated with API had a firearm. The Tribe alleges API seized tribal property, assaulted and falsely imprisoned Tribe members and employees, intentionally damaged Tribal property and misappropriated the Tribe's trade secrets. Additionally, API took control of the Tribe's gaming information, including the Tribe's financial records, surveillance, ongoing gaming investigations, personnel files and legal files.

### IV. ANALYSIS

### A. Parties' Arguments

In the Complaint, API asks the court for a declaratory judgment that the Tribal Court may not exercise civil jurisdiction over API. API alleges the Tribe breached the Agreement and seeks damages for the breach.

In its Motion to Dismiss, the Tribe argues the court must dismiss the instant action because (1) the court lacks subject matter jurisdiction over the dispute; (2) sovereign immunity bars the Tribe from being sued in the instant action; and (3) API has failed to state a claim upon which relief can be granted. The Tribe also argues the Tribal Court has

civil jurisdiction over API with respect to the Tribe's tort claims.

In its Motion for Summary Judgment, API argues (1) the court has subject matter jurisdiction over the Complaint; (2) the Walker Council waived the Tribe's sovereign immunity in the Agreement pursuant to the arbitration clause; and (3) the Tribal Court has no civil jurisdiction over API. The court examines each of these arguments below.

### B. Subject Matter Jurisdiction and Sovereign Immunity

The Tribe argues the court must dismiss the instant action for lack of subject matter jurisdiction because it "has not waived its sovereign immunity from this suit." Brief in Support of Motion to Dismiss (docket no. 48-2), at 8. The Tribe conflates subject matter jurisdiction and sovereign immunity. As the Eighth Circuit Court of Appeals noted,

> [S]overeign immunity is jurisdictional in nature. Sovereign immunity, however, is not of the same character as subject matter jurisdiction. First of all, tribal sovereign immunity may be waived in certain circumstances and is subject to the plenary power of Congress. Lack of subject matter jurisdiction, on the other hand, may not be waived. Second, sovereign immunity operates essentially as a party's possible defense to a cause of action. In contrast, subject matter jurisdiction is primary and an absolute stricture on the court. Finally, a waiver of sovereign immunity cannot extend a court's subject matter jurisdiction.
>
> We find, therefore, that sovereign immunity is a jurisdictional consideration separate from subject matter jurisdiction[.]

*In re Prairie Island Dakota Sioux*, 21 F.3d 302, 304-05 (8th Cir. 1994) (internal citations omitted); *see also Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous.*, 207 F.3d 21, 28 (1st Cir. 2000) ("[A]lthough tribal sovereign immunity is jurisdictional in nature, consideration of that issue always must await resolution of the antecedent issue of federal subject-matter jurisdiction."). Accordingly, the court first considers whether it has subject matter jurisdiction over the instant action and then proceeds to determine whether sovereign immunity applies.

### C. Subject Matter Jurisdiction

The party seeking to establish the court's subject matter jurisdiction, API, bears the burden of proving it. *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990). API alleges the court has subject matter jurisdiction over the Tribe under Count I, the request to bar the Tribal Court's exercise of civil jurisdiction over API, pursuant to 28 U.S.C. § 1331. API alleges the court has supplemental jurisdiction over Count II, its breach of contract claim, pursuant to 28 U.S.C. § 1367(a).[4]

### 1. Count I: request for declaratory judgment

The court has federal question subject matter jurisdiction over Count I, API's request for a declaratory judgment concerning the Tribal Court's exercise of civil jurisdiction over API. Count I requires the court to decide whether the Tribal Court may exercise civil jurisdiction over API, a non-Indian. "The question of whether an Indian tribe has the power to compel a non-Indian to submit to the civil jurisdiction of a tribal court is a federal question under 28 U.S.C. § 1331." *DeMent v. Oglala Sioux Tribal Court*, 874 F.2d 510, 513 (8th Cir. 1989) (citing *Nat'l Farmers Union*, 471 U.S. at 852).

### 2. Count II: breach of contract

As in other cases, to exercise supplemental jurisdiction over a claim against an Indian tribe, "the 'claims within the action' must 'derive from a common nucleus of operative fact.'" *Auto-Owners Ins. Co. v. Tribal Court of Spirit Lake Indian Reservation*, 495 F.3d 1017, 1024 (8th Cir. 2007) (quoting *Myers v. Richland County*, 429 F.3d 740, 745 (8th Cir. 2005)); *see also Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008) (exercising supplemental jurisdiction over plaintiff's state law contract claim against a tribe in Indian Gaming Regulatory Act case). "A plaintiff's claims derive from a

---

[4] The Complaint contains a typographical error. In its jurisdictional statement, API alleges the court derives supplemental jurisdiction over the breach of contract claim pursuant to "28 U.S.C. §[]1365(a)." Complaint at ¶ 7. Section 1365(a) governs a court's jurisdiction over actions brought by the United States Senate, not supplemental jurisdiction.

common nucleus of operative fact if the 'claims are such that [the plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" *OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 350 (8th Cir. 2007) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

The torts forming the basis of the Tribe's claims against API are all rooted in the Agreement, because API raided the Casino pursuant to its terms. The court is satisfied that API's claims arise from a common nucleus of operative fact. Therefore, the court shall exercise supplemental jurisdiction over Count II.

### D. Sovereign Immunity

Next, the court turns to consider whether sovereign immunity bars the court's exercise of jurisdiction in this case. "While federal jurisdiction exists [. . .], [a tribe]'s sovereign immunity [may] still bar[] claims from being brought against it unless [its] immunity has been waived by the tribe or unequivocally abrogated by Congress." *Ho-Chunk Nation*, 512 F.3d at 936 (internal quotation marks omitted). "It is well settled 'that Indian tribes possess the same common-law immunity from suit traditionally enjoyed by sovereign powers.'" *Mo. River Servs., Inc. v. Omaha Tribe of Neb.*, 267 F.3d 848, 852 (8th Cir. 2001) (quoting *Val-U Constr. Co. v. Rosebud Sioux Tribe*, 146 F.3d 573, 576 (8th Cir. 1998)). "[A] tribe may waive its immunity, but 'a tribe's waiver must be "clear."'" *Id.* (quoting *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001)). A tribe may waive its immunity in an arbitration agreement. *Id.*

The Tribe argues sovereign immunity bars the court from adjudicating both Count I and Count II. The court examines the application of the doctrine of sovereign immunity as to each count separately.

### 1. Count I: request for declaratory judgment

The Tribe argues that sovereign immunity bars Count I, that is, API's request for

a declaratory judgment concerning the propriety of the Tribal Court's exercise of civil jurisdiction over API.

Although there do not appear to be any cases discussing whether sovereign immunity bars a federal district court from considering this issue, controlling precedent clearly presumes that sovereign immunity does *not* bar a district court from reviewing a tribal court's decision to exercise civil jurisdiction over a non-member. *See, e.g.*, *Bruce H. Lien*, 93 F.3d at 1421 ("[T]he tribal courts themselves are given the first opportunity to address their [civil] jurisdiction and explain the basis (or lack thereof) to the parties. *As a jurisdictional inquiry, appeal of this issue may be had in the federal district court.*") (internal citations omitted) (emphasis added); *Duncan Energy*, 27 F.3d at 1300 (8th Cir. 1994) ("Once tribal court remedies have been exhausted, a [t]ribal [c]ourt's determination of tribal [civil] jurisdiction may be reviewed in the federal district court.") (citing *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 19 (1987)). The court also notes that, if sovereign immunity barred this claim, then no federal district court could consider this issue. The wealth of federal case law concerning tribal court civil jurisdiction over non-members demonstrates that sovereign immunity does not bar a district court from considering this matter.

To be sure, principles of sovereign immunity prevent a federal district court from considering this question before a tribal court has considered it. In November of 2005, this court stayed the instant action because the parties had not exhausted Tribal Court remedies concerning the Tribal Court's exercise of civil jurisdiction over API. *API v. Sac & Fox Tribe of the Miss. in Iowa*, 401 F. Supp. 2d 952, 958 (N.D. Iowa 2005 ) (Reade, C.J.). In doing so, the court recognized that "the examination of tribal sovereignty and jurisdiction should be conducted in the first instance by the tribal court itself[.]" *Duncan Energy Co. v. Three Affiliated Tribes of Fort Berthold Reservation*, 27 F.3d 1294, 1299 (8th Cir. 1994); *see also LaPlante*, 480 U.S. at 16 (applying exhaustion rule to diversity

cases and holding a federal court should "stay its hand in order to give the tribal court a full opportunity to determine its own jurisdiction" (internal quotation marks omitted)).

As discussed above, the parties have exhausted Tribal Court remedies on the civil jurisdiction issue. The Tribal Court found that its exercise of civil jurisdiction over API was proper. The Tribal Court of Appeals affirmed that decision. Because the civil jurisdiction question has been fully exhausted in the Tribal Court system, sovereign immunity does not bar the court's consideration of this issue.

In conclusion, the court finds that sovereign immunity does not bar Count I.

### 2.      Count II: breach of contract

Next, the court turns to consider whether sovereign immunity bars Count II, API's breach of contract claim. API argues the Walker Council waived the Tribe's sovereign immunity as to Count II when the Walker Council entered into the Agreement containing the arbitration clause on behalf of the Tribe. Absent waiver by a tribe or action by Congress, "[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation." *Kiowa Tribe of Okla. v. Mfg. Tech., Inc.*, 523 U.S. 751, 760 (1998). A tribe's consent to arbitration may operate as a waiver of its sovereign immunity. *C & L Enters.*, 532 U.S. at 423.

The validity of the Agreement turns on whether the Walker Council was the governing body of the Tribe at the time the Agreement was executed. As the court previously noted, the question over the Tribe's true governing body is an intra-tribal dispute and not subject to the court's jurisdiction. *API*, 401 F. Supp. 2d at 961 (citing *Longie v. Spirit Lake Tribe*, 400 F.3d 586, 589 (8th Cir. 2005) (explaining that federal courts should refrain from exercising jurisdiction pursuant to 28 U.S.C. § 1331 when the case involves an intra-tribal dispute)); *In re Sac & Fox Tribe*, 340 F.3d at 766 (affirming this court's decision that it lacked subject matter jurisdiction to resolve an intra-tribal

leadership dispute).

The Tribal Court determined the Walker Council was not the governing body at the time the Agreement was executed and that the Agreement was therefore not binding. Accordingly, the court defers to the Tribal Court's finding that the Agreement is not valid and finds any waiver of sovereign immunity in the Agreement to be *ultra vires*. *See Prescott v. Little Six, Inc.*, 387 F.3d 753, 756-57 (8th Cir. 2004) ("[W]e defer to the tribal courts' interpretation of tribal law.").

API argues the Tribal Court's determination that the Agreement is invalid has no bearing on the Walker Council's ability to waive the Tribe's sovereign immunity. The court disagrees. The Eighth Circuit Court of Appeals has held a challenge to the validity of a contract with a tribe "calls into question all provisions contained therein (including provisions relating to arbitration, sovereign immunity, and federal district court jurisdiction)." *Bruce H. Lien Co*, 93 F.3d at 1417. If the Walker Council was not authorized to enter into the Agreement, then it follows that it was not authorized to waive the Tribe's sovereign immunity pursuant to the arbitration clause contained in the Agreement. *Id.*; *see also* 42 C.J.S. *Indians* § 22 (Online ed. 2008) ("A tribal official cannot waive the tribe's immunity unless authorized to do so by tribal law."). The Tribal Court held the Walker Council was not the Tribe's governing body at the time the Walker Council purported to enter into the Agreement and waive the Tribe's sovereign immunity through the arbitration clause. API presents no other evidence that the Tribe waived its sovereign immunity. Accordingly, the court finds the Tribe did not waive its sovereign immunity to be sued for breach of the Agreement in this court. As a result, the Tribe's sovereign immunity bars API from bringing its breach of contract claim in this court.[5]

---

[5] Because sovereign immunity bars the court's consideration of API's breach of contract claim, it need not address the Tribe's alternative argument that API's breach of contract claim fails to state a claim upon which relief can be granted.

This holding is limited in scope to Count II, the breach of contract claim. As set forth above, sovereign immunity does not bar the court from considering Count I, the request for a declaratory judgment concerning the Tribal Court's exercise of civil jurisdiction over API.[6]

## E. Tribal Court's Jurisdiction Over API

Next, the court turns to consider whether the Tribal Court may exercise civil jurisdiction over API with respect to the Tribe's tort claims in light of the fact that API is a non-Indian third party. Generally, a tribe may not exercise civil jurisdiction over non-Indian third parties. *See Montana v. United States*, 450 U.S. 544, 565 (1981). There are two exceptions to this general rule. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships

---

[6] API argues a provision in the Code of Federal Regulations, 25 C.F.R. § 83.2 (2009), supports its argument that the Tribe waived its sovereign immunity in the Agreement. Section 83.2 states that when the BIA acknowledges a tribe's existence, the recognized tribe "is entitled to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations and obligations of such tribes." 25 C.F.R. § 83.2. API insists the BIA's acknowledgment that the Walker Council was the Tribe's governing council at the time the Agreement was executed "vested the Walker Council with power over the Tribe's federal sovereign immunity." Brief in Support of Motion for Summary Judgment (docket no. 63), at 19. API cites no authority for this interpretation of § 83.2.

In the court's view, API misapprehends the purpose of § 83.2, which is "to establish a departmental procedure and policy for acknowledging that certain American Indian groups exist as tribes." *See* 25 C.F.R. § 83.2. This regulation does not give an invalid tribal council the power to waive a tribe's sovereign immunity simply because it is recognized as a tribe's governing body by the BIA. Moreover, as with other sovereign nations, sovereign immunity inheres to a tribe as a nation—not to a coalition of tribe members purporting to act as a tribe's governing authority. *See Ninigret Dev.*, 207 F.3d at 29 (noting a tribe's "sovereign immunity predates the birth of the Republic" and "rests on the status of Indian tribes as autonomous political entities, retaining their original natural rights with regard to self-governance") (internal quotation marks omitted).

with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* Second, a tribe has civil jurisdiction over non-Indians when a non-Indian engages in conduct on tribal land that "threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe." *Id.* at 566. "These exceptions are limited ones, and cannot be construed in a manner that would swallow the rule or severely shrink it[.]" *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 128 S. Ct. 2709, 2720 (2008) (internal citations and quotation marks omitted). A tribal court must first examine whether it has civil jurisdiction over a non-Indian, and, after the tribal court completes its examination, a district court has federal question jurisdiction to review whether a tribal court has exceeded the lawful limits of its jurisdiction. *Nat'l Farmers*, 471 U.S. at 856.[7]

### 1. Protective prong

The Tribe (Bear) argues the Tribal Court has civil jurisdiction over API under the protective prong of the *Montana* exception: "A tribe may [. . .] retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566.

---

[7] The Tribal Court of Appeals drew an unusual distinction between tortious nonmember conduct on fee land and tortious nonmember conduct on trust land; namely, that *Montana* applies only to tribal fee lands, not tribal trust lands. The Tribal Court of Appeals concluded that, because the Casino is on trust land rather than fee land, *Montana* should not apply, and, consequently, the "Tribe retain[ed] *presumptive* civil jurisdiction" over API. Tribal Court of Appeals Order at 16 (emphasis in original). API challenges this conclusion. After concluding *Montana* did not apply, however, the Tribal Court of Appeals applied the traditional *Montana* analysis and concluded in the alternative that, even if *Montana* applied, the Tribal Court had jurisdiction over API under *Montana*. As set forth below, the court agrees with the Tribal Court of Appeals's alternate conclusion. Accordingly, the court need not consider whether *Montana* applies to Tribal land held in trust because the Tribal Court's civil jurisdiction over API is proper in any event.

"The conduct must do more than injure the tribe, it must 'imperil the subsistence' of the tribal community." *Plains Commerce*, 128 S. Ct. at 2727 (quoting *Montana*, 450 U.S. at 566). "'[T]he elevated threshold for application of [this] *Montana* exception suggests that tribal power must be necessary to avert catastrophic consequences.'" *Id.* (quoting F. Cohen, Handbook of Federal Indian Law § 4.02[3][c] at 232, n.220 (2005 ed.)). Federal courts recognize that "it can be argued that torts committed by or against Indians on Indian land always threaten or have some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Philip Morris USA, Inc. v. King Mtn. Tobacco Co., Inc.*, 552 F.3d 1098, 1109 (9th Cir. 2009) (internal quotation marks omitted). Accordingly, a federal district court should bear in mind that the "generalized threat that torts by or against its members pose for any society[] is not what the [protective] *Montana* exception is intended to capture." *Id.* (citing *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 657 n.12 (2001) ("*Montana*'s second exception can be misperceived. The exception is only triggered by *nonmember conduct* that threatens the Indian tribe; it does not broadly permit the exercise of civil authority wherever it might be considered necessary to self-government.") (emphasis in original)). Instead, *Montana*'s protective exception "envisions situations where the conduct of the nonmember poses a direct threat to tribal sovereignty." *Id.* (citing *Atkinson*, 532 U.S. at 657 n.12).

The court agrees with the Tribe's assessment that "[a] case more suitable for application of the 'protective' prong can scarcely be imagined." *See* Tribe's Resistance Brief (docket no. 86-3), at 17. API's conduct had a "direct effect" on both the political integrity and the economic security of the Tribe. *Montana*, 450 U.S. at 566. And, API's conduct did more than injure the Tribe—it "imperil[ed]" its subsistence. *Plains Commerce*, 128 S. Ct. 2727. The court examines API's impact on the Tribe's political integrity and economic security, in turn.

### i. *Political integrity*

API's conduct imperiled the Tribe's political integrity. In essence, API invaded the Tribe's land to quell an intra-tribal governmental dispute. API argues this intra-tribal dispute was merely incidental to the raid. API contends that, if the court finds the raid imperiled the Tribe's political integrity, any action taken by a non-member on tribal land during an intra-tribal governmental dispute would justify a court's invocation of the second *Montana* exception. The court disagrees. API's actions were made and intended to be a direct challenge to the Bear Council. API raided the Casino on behalf of the Walker Council, which was not the Tribe's true governing authority. API conducted the raid pursuant to the Agreement, and the Agreement's terms indicate the services API was expected to provide related directly to the Tribe's governmental affairs. *See* Agreement at ¶ I.2.A (stating API "shall perform services directly relating to the investigation of a takeover by dissidents at the [Casino] located on the Tribe's reservation lands" and "[i]nvestigat[e] [. . .] individuals involved in the unlawful acts against the Tribal Government"). In other words, API was hired to assist in the resolution of an intra-tribal governmental dispute, which strikes at the heart of the second *Montana* exception. The fact API believed it was operating with the consent of the Tribe's governing authority, that is, the ousted Walker Council, has no effect on the application of this exception. In truth and in fact, API raided the Casino specifically to weaken one side of an intra-tribal governmental dispute, which happened to be the Bear Council, the Tribe's true governing body. This is an act with potentially catastrophic consequences to the Tribe's government. The court concludes this merits the application of the protective prong of the *Montana* exception and that the Tribal Court's exercise of civil jurisdiction over API was proper.

### ii. *Economic security*

API's conduct also imperiled the Tribe's economic security. The center of API's activity was the raid of the Casino, which is the Tribe's economic hub. As the Tribal

Court of Appeals noted, the Casino "is the Tribe's economic engine, and is where some of the Tribe's most sensitive documents are kept. It was precisely these things over which API sought control, on behalf of the Walker Council." Tribal Appeals Court Order at 16. The Tribe's economic viability turns on the Casino's operations, and API sought to wrest control of the Casino out of the hands of the Tribe's true governing body, the Bear Council, and into the hands of the Walker Council. The fact API believed it was operating pursuant to the Tribe's authority does not change the fact that API forcefully and intentionally compromised the Tribe's economic center. The court finds API's raid of the Casino had potentially catastrophic consequences to the Tribe's continuing economic security.

API argues the Casino was not operating at the time the raid occurred, thereby diminishing the economic instability the raid created. Even so, the raid of the Casino had potentially catastrophic consequences to the Tribe. API sought to transfer control of the Casino to Tribe members who were without authority to manage and operate the Casino. API also misappropriated Casino trade secrets. These and other acts had a potentially devastating impact on the continuing viability of the Casino, whether or not it was operating at the time of the raid.

### iii.    Cases applying protective prong

The cases in which courts have applied the second *Montana* exception are aligned with the instant action.

In *Babbitt Ford, Inc. v. Navajo Indian Tribe*, the Ninth Circuit Court of Appeals held the protective prong of *Montana*'s jurisdictional exception applied to an automobile company's repossession of a vehicle on tribal land. 710 F.2d 587, 593 (9th Cir. 1983). The *Babbitt* court reasoned this conduct had a direct effect on the tribe's health and welfare because "[r]epossession of an automobile has the potential to leave a trib[e] member stranded miles from his or her nearest neighbor" and "repossession without the consent

of the tribe member also may escalate into violence, particularly if others join the affray." *Id.*

In *Fry v. Colville Tribal Court of the Confederated Tribes of the Colville Reservation*, a district court applied the second *Montana* exception due to a stipulated judgment designating jurisdiction in the tribal court because "the nonmember defendant put the political integrity of the tribe and the tribal court at issue in any failure to abide by the terms of the judgment." No. CV-07-0178-EFS, 2007 WL 2405002, *3 (E.D. Wash. Aug. 17, 2007). The judgment at issue provided for the disposition of a significant amount of real and personal property within tribal boundaries. *Id.*

In *Elliot v. White Mountain Apache Tribal Court*, a district court held the second *Montana* exception likely applied because a non-member's conduct caused a fire that burnt a great deal of timber on the tribe's land. No. CIV 05-4240-PCT-MHM, 2006 WL 3533147, *5 (D. Ariz. Dec. 6, 2006). The court held this impacted the tribe's ability to use its own land. *Id.* The court reasoned the non-member's conduct "threaten[ed] the economic security of the tribe based upon the interference of the use of the tribe's land and timber and the overall welfare of the tribe as such resources are material to the tribe's stability." *Id.*

In *Cheromiah v. United States*, a district court applied the second *Montana* exception in a case involving a medical malpractice claim against a medical services provider. 55 F. Supp. 2d 1295, 1305 (D.N.M. 1999). The hospital "provide[d] the only western medical care most [. . .] Tribe members receive[d]." *Id.* The court held "[m]alpractice by the major medical provider to the Tribe has a significant impact on 'the right of reservation Indians to make their own laws and be ruled by them' as it may jeopardize their very ability to survive as a people." *Id.* (quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 458 (1997)).

In summary, the court finds that the second *Montana* exception applies and that the

Tribal Court's exercise of civil jurisdiction over API was proper.

### 2.      Consent prong

The Tribe also argues the Tribal Court has civil jurisdiction over API under the consent prong of the *Montana* analysis.  Because the court has already found the Tribal Court's exercise of civil jurisdiction over API was proper under the protective prong of the *Montana* exceptions, the court need not address this issue.  The court notes, however, that both the Tribal Court and Tribal Court of Appeals declined to apply this *Montana* exception.  This court would do the same.  *See, e.g. Montana*, 450 U.S. at 565 ("A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.").

### 3.      Miscellaneous arguments

API argues that two other factors bar the Tribal Court from exercising civil jurisdiction over API: (1) 25 C.F.R. § 83.2 and (2) the arbitration clause.  The court addresses these arguments, in turn.

#### i.      Section 83.2

API argues that the question of whether the Walker Council had authority to enter into the Agreement and choose arbitration for dispute resolution is a matter of federal law, not tribal law.  API claims the question of who "the 'true' governing council of a tribe *for tribal issues* is simply irrelevant to the *federal issue* of who can waive the tribe's sovereign immunity and agree to resolve disputes in a non-tribal forum."  API Summary Judgment Motion Br. at 17 (emphases in original).  In support of this argument, API cites 25 C.F.R. § 83.2, the regulation discussed above that gives rise to federal recognition of Indian tribes.  API contends that, because the BIA and NIGC recognized the Walker Council as the governing body of the Tribe under § 83.2, this recognition attributed federal powers to the Walker Council, including the federal power to waive sovereign immunity through

an arbitration clause.

For the same reasons discussed above, the court finds § 83.2 is inapplicable. As the Tribal Court of Appeals held, "[t]he BIA recognition process exists for the benefit of the federal-tribal relationship, not to give disappointed third parties an authority higher than the tribe as to tribal law." Tribal Court of Appeals Order at 9. The Tribal Court found the Walker Council was without authority to enter into the Agreement. The Walker Council was therefore without the authority to bind the Tribe to the arbitration clause in the Agreement. The court will not apply § 83.2 to void the Tribal Court's finding on the Tribe's intra-tribal governmental dispute or its effect on the Agreement.

API argues that, if the court does not interpret and apply § 83.2 in the manner it suggests, "[a]ny private business doing business with a tribe during an intra-tribal leadership dispute would run the risk of its [a]greement being voided by subsequent events beyond its control when a new tribal council came into power." API Summary Judgment Br. at 22. The court recognizes this risk; however, this is a risk API chose to take. As the Tribal Court of Appeals noted, a "chilling effect" on a nonmember's negotiation with a tribe may be "inevitable" given the possibility of intra-tribal disputes. Tribal Court of Appeals Order at 10. However, "businesses that choose to work with an affirmatively *ousted* tribal council are taking a substantial risk. They ought not be heard [to] complain when the gamble fails." *Id.* (emphasis in original). The court concludes the unique set of facts giving rise to the Tribal Court's civil jurisdiction is unusual and appropriate for *Montana*'s rarely applied protective exception.

### ii. *Arbitration clause*

API's argument that the arbitration clause in the Agreement bars the Tribal Court from exercising civil jurisdiction is a non-starter. As the court noted in its earlier decision:

> Before the arbitration clause in the Agreement can be enforced, a court must determine whether the Agreement is valid. If [the Walker Council] had authority to enter into the

> Agreement and it was validly formed, then, the court agrees that the arbitration clause should be enforced. If, however, on the other hand, [the Walker Council] was without authority to enter into the Agreement on behalf of the Tribe and the Agreement is found to be an invalid and unenforceable contract, the provisions of the contract, including the arbitration clause, cannot be enforced.

*Attorney's Process*, 401 F. Supp. 2d at 961. The Tribal Court found the Agreement is void. The arbitration clause contained in the Agreement is therefore unenforceable. *Id.*; *see also Bruce H. Lien Co.*, 93 F.3d 1417 (noting a challenge to the validity of a contract with a tribe also challenges the validity of an arbitration agreement in the contract). The arbitration clause cannot operate to bar the Tribal Court from exercising civil jurisdiction over API because the Bear Council never agreed to it.

In summary, the court concludes the Tribal Court's exercise of civil jurisdiction over API is proper.

### V. CONCLUSION

In light of the foregoing, **IT IS ORDERED THAT**:

(1)    The Motion to Dismiss (docket no. 48) is **GRANTED**;

(2)    The Summary Judgment Motion (docket no. 63) is **DENIED**; and

(3)    The Complaint (docket no. 2) is **DISMISSED**. The Clerk of Court is **DIRECTED** to close this case.

**IT IS SO ORDERED.**

**DATED** this 18th day of June, 2009.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA