**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

ATTORNEY'S PROCESS AND
INVESTIGATION SERVICES, INC.,

        Plaintiff,

vs.

SAC & FOX TRIBE OF THE
MISSISSIPPI IN IOWA,

        Defendant.

No. 05-CV-168-LRR

**ORDER**

―――――――――――

### *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*   *FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

*IV.*   *LEGAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*

    *A.*    *The* **Montana** *Exceptions* . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
    *B.*    *This Court's Application of* **Montana** . . . . . . . . . . . . . . . . . . *8*
    *C.*    *Eighth Circuit's Application of* **Montana** . . . . . . . . . . . . . . . . *8*
        *1.*    *Trespass and trade secret claims* . . . . . . . . . . . . . . . . *8*
        *2.*    *Conversion claim* . . . . . . . . . . . . . . . . . . . . . . . . . *9*
            *a.*    *Second* **Montana** *exception* . . . . . . . . . . . . . . . *9*
            *b.*    *First* **Montana** *exception* . . . . . . . . . . . . . . . . *10*

*V.*     *PARTIES' ARGUMENTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

*VI.*    *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

    *A.*    *Tribal Court of Appeals' Views on First* **Montana** *Exception* . . . . . *12*
    *B.*    *Jurisdiction under the First* **Montana** *Exception* . . . . . . . . . . . *13*
    *C.*    *Location of API's Conduct* . . . . . . . . . . . . . . . . . . . . . . . *14*
        *1.*    *Land status* . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*
        *2.*    *Where the conduct occurred* . . . . . . . . . . . . . . . . . . *19*
        *3.*    *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *23*

    **D.**    ***Tribe's Alternative Request*** . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**VII.**  **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

# I. INTRODUCTION

This matter is before the court on remand from the Eighth Circuit Court of Appeals. *See Attorney's Process Investigation Servs., Inc. v. Sac & Fox Tribe of the Miss. in Iowa* ("*API*"), 609 F.3d 927 (8th Cir. 2010), *cert. denied*, 131 S.Ct. 1003 (2011). The sole issue is whether the Court of the Sac & Fox Tribe of the Mississippi in Iowa ("Tribal Court") has jurisdiction over the Sac & Fox Tribe of the Mississippi in Iowa's ("Tribe") claim against Attorney's Process and Investigation Services, Inc. ("API") for conversion of tribal funds. *See id.* at 946.

## II. PROCEDURAL BACKGROUND

The Tribe sued API in the Tribal Court alleging trespass, conversion of tribal funds and misappropriation of trade secrets. *See Sac & Fox Tribe of the Miss. in Iowa v. Attorney's Process Investigation Servs., Inc.*, Tribal Court case no. API-CV-Damages-2005-01. The Tribe's claims arise from API's efforts to take control of facilities on the Tribe's reservation under a contract signed by Alex Walker, Jr., the former Chairman of the Tribal Council. The Tribe's conversion claim is based on the payment of more than $1 million of tribal funds to API under its contract with Walker.

API brought this action seeking a declaratory judgment that the Tribal Court lacked jurisdiction,[1] and the court ordered API to exhaust its remedies in the Tribal Court. *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856-57 (1985). The Tribal Court concluded that it had subject matter and personal jurisdiction. It also

---

[1] API also sought an order compelling arbitration pursuant to its contract with Walker. This claim is no longer at issue. *See API*, 609 F.3d at 946 (affirming dismissal of API's claim for an order compelling arbitration).

held that Walker and his council had been removed from office before June of 2003 and, therefore, lacked authority to bind the Tribe to the contract he signed with API.  The Tribal Court of Appeals affirmed, holding that Walker's contract with API was invalid and that the Tribal Court had jurisdiction over the Tribe's claims.

After exhausting its remedies in the Tribal Court, API returned to this court.  The Tribe filed a Motion to Dismiss (docket no. 48), arguing that the court lacked subject matter jurisdiction and jurisdiction over the Tribe.  API filed a Motion for Partial Summary Judgment (docket no. 63), arguing that the Tribal Court lacked subject matter jurisdiction.

On June 18, 2009, the court entered an Order (docket no. 87) that denied API's Motion for Partial Summary Judgment and granted the Tribe's Motion to Dismiss.  In doing so, the court held that the Tribal Court had jurisdiction over the Tribe's claims under *Montana v. United States*, 450 U.S. 544 (1981).[2]  The court also concluded that whether Walker had authority to bind the Tribe to the agreement with API was a matter of tribal law and, therefore, deferred to the Tribal Court's determination that Walker lacked the authority to do so.

API appealed, arguing that the Tribal Court lacked jurisdiction over the Tribe's claims and that this court erred in its application of *Montana*.  The Eighth Circuit affirmed that the Tribal Court could exercise jurisdiction over the Tribe's trespass and trade secret claims.  *API*, 609 F.3d at 946.  However, the Eighth Circuit reversed and vacated "only that portion of the judgment which concluded that the Tribal Court has jurisdiction under the second *Montana* exception over the Tribe's claim for conversion of tribal funds." *Id.* Accordingly, the Eighth Circuit remanded "the question of whether tribal court jurisdiction

---

[2] *Montana* identified two exceptions to "the general proposition" that a tribe's civil jurisdiction does "not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565-66.

exists over that claim under the first *Montana* exception." *Id.*

On February 7, 2011, the Tribe filed a Motion for Summary Judgment ("Tribe's Motion") (docket no. 112), arguing that the Tribal Court correctly held that it had jurisdiction over the Tribe's conversion claim. In the event the court holds otherwise, the Tribe asks the court to enter judgment in favor of the Tribe on its conversion claim.

On March 29, 2011, API filed a Resistance (docket no. 117) to the Tribe's Motion. That same date, API filed a Cross-Motion for Summary Judgment ("API's Motion") (docket no. 118), arguing that the Tribal Court lacks jurisdiction over the conversion claim under the first *Montana* exception. On May 2, 2011, the Tribe filed a combined Resistance and Reply (docket no. 129) in opposition to API's Motion and in support of the Tribe's Motion. On May 12, 2011, API filed a Reply (docket no. 131).

Neither side requests oral argument on the Motions, and the court concludes that oral argument is unnecessary. The Motions are fully submitted and ready for decision.

### III.  FACTUAL BACKGROUND[3]

The Tribe is a federally recognized Indian tribe governed by a seven member Tribal Council. The Tribe owns and operates the Meskwaki Bingo Casino Hotel ("Casino"). The Casino is located on the Tribe's trust lands, known as the Meskwaki Settlement, in Tama, Iowa. Alex Walker, Jr. is a member of the Tribe and at all relevant times resided on tribal-owned land within the Tribe's Settlement. Prior to March of 2003, Walker was Chairman of the Tribal Council.

---

[3] The court's recitation of the facts draws on the Eighth Circuit's opinion and the record before this court, as well the record developed in the Tribal Court and the allegations in the Tribal Court complaint. *See API*, 609 F.3d at 937 (relying on Tribal Court record and taking Tribe's allegations as true for jurisdictional purposes because "API has not contested any of the material allegations made by the Tribe"). Both sides criticize portions of each other's statements of fact and respective responses. Because the purported deficiencies are immaterial under the court's resolution of the issues, the court need not address them further.

In the spring and summer of 2003, two groups were competing for control of the tribal government, finances and Casino. Walker led one group (the "Walker Council"), and Charles Old Bear headed up the opposition (the "Bear Council"). In May of 2003, the Bear Council prevailed in a tribal election. Walker then turned to API, a Wisconsin corporation that provides security and consulting services to casino operators.

On June 16, 2003, Walker entered into a written contract—purportedly on behalf of the Tribe—with API for investigation, security and law enforcement consulting services. API agreed to "perform services directly relating to the investigation of a takeover by dissidents at the Tribe's facility located on the Tribe's reservation lands." Tribe's Appendix ("Tribe App'x") (docket no. 112-3) at 22. In furtherance of this goal, API agreed its services would "include, but not be limited to, the following:"

> A. Investigation of individuals involved in the unlawful acts against the Tribal Government.
>
> B. Developing a security plan for the re-opening of the Tribe's Gaming Facility.
>
> C. Research the feasibility of establishing Tribal police powers and assisting in the training and deployment of same if feasible.
>
> D. Provide general community security services to Tribal Government and its operations as is feasible.
>
> E. Investigate allegations of unlawful acts and tribal policy violations of the dissident group involving Tribal funds, and gaming operations.
>
> F. Assist in general security matters as directed by the Tribal government.

*Id.* at 22-23. The contract also contained an arbitration clause and provided that any award would be enforced in Iowa state or federal court. The Tribe was not a party to the contract and has "not enter[ed] into any agreement with API." *API*, 609 F.3d at 945.

Between June 30 and September 30, 2003, API received $1,022,171.26 in tribal

funds under its agreement with Walker. The Tribal Council did not consent to any payment of tribal funds to API. Neither the Tribal Chairman nor the Tribal Council Treasurer signed any documents permitting payment of tribal funds to API.

On October 1, 2003, the Bear Council and its supporters occupied the Casino and the Tribe's government offices. Early that day, approximately thirty API agents forced their way into the Casino and the Tribe's community center, which houses the Tribe's government offices. Both buildings are located on tribal trust land. During the raid, API damaged and destroyed tribal property and seized confidential information about the Tribe's gaming operations and finances. Despite the raid, the Walker Council never regained control of the Casino or tribal government.

On August 3, 2005, the Tribe filed a complaint against API in the Tribal Court, alleging trespass, misappropriation of trade secrets and conversion. With respect to the Tribal Court's jurisdiction, the Tribe alleged:

> 1.    [The Tribal Court] has subject matter jurisdiction in this matter . . . because the cause of this action arose within the jurisdiction of the Tribe, because the Tribe brings this suit to cause [API] to return funds to the Tribe which [API] unlawfully has taken and retained, and because [API] committed torts against the Tribe and harm to tribal real property and to other tribal property on the Settlement.

Tribe App'x at 1. Regarding its conversion claim, the Tribe alleged, in part:

> 4.    Between approximately June and October 2003, [API] took possession of approximately $1,022,171.26 in tribal funds.

> 5.    The Tribe's governing body did not authorize the payment of tribal funds to [API].

> 6.    On or about February 6, 2004, the Tribe demanded return of the funds which [API] had taken. [API] did not return any tribal funds.

*Id.* at 2.

6

## IV.  *LEGAL BACKGROUND*

The court begins with the principles governing tribal jurisdiction over nonmembers. The court will then briefly summarize the application of these principles to this case by this court and the Eighth Circuit Court of Appeals.

### A.  *The* **Montana** *Exceptions*

Generally, a tribe may not exercise civil jurisdiction over nonmembers.  *See Montana*, 450 U.S. at 565.  However, this rule is subject to two independent exceptions. First, a "tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."  *Id.*  Second, a tribe may "exercise civil authority over the conduct of non-Indians . . . within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Id.* at 566.

In applying the *Montana* exceptions to nonmembers, "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction."[4]  *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997).  Stated differently, "a tribe's inherent adjudicative jurisdiction over nonmembers is at most only as broad as its legislative jurisdiction."  *Nevada v. Hicks*, 533 U.S. 353, 367 (2001).  It remains an open question, however, "whether a tribe's adjudicative jurisdiction over nonmember defendants *equals* its legislative jurisdiction." *Id.* at 358.  "Because 'efforts by a tribe to regulate nonmembers . . . are presumptively invalid,' the Tribe bears the burden of showing that its assertion of jurisdiction falls within one of the *Montana* exceptions."  *API*, 609 F.3d at 936 (quoting *Plains Commerce Bank*

---

[4] *Montana* addressed a tribe's regulatory, or legislative, authority, such as its ability to tax nonmember activities or prohibit certain nonmember activities on tribal land.  In *Strate*, however, the Court made clear that *Montana* also governs assertions of tribal adjudicatory jurisdiction over nonmembers.  *See Strate*, 520 U.S. at 453 (stating that *Montana* applies to a tribe's "civil authority" over nonmembers).

*v. Long Family Land & Cattle Co.*, 554 U.S. 316, 330 (2008)).

## B.   This Court's Application of Montana

In granting the Tribe's Motion to Dismiss, this court held that the Tribal Court had jurisdiction over the Tribe's claims under the second *Montana* exception because "API's conduct had a 'direct effect' on both the political integrity and the economic security of the Tribe." Order at 17 (quoting *Montana*, 450 U.S. at 566). Accordingly, the court did not decide whether the Tribal Court could exercise jurisdiction over the Tribe's claims under the first *Montana* exception.

## C.   Eighth Circuit's Application of Montana

On appeal, the Eighth Circuit explained that the Tribe's claims "arise from two related, but ultimately distinct, courses of conduct." *API*, 609 F.3d at 938.

> First, the Tribe alleges that between the time the contract was signed in June and the end of September 2003, API took possession of over $1 million in tribal funds without the authorization of the Tribe's duly elected governing body. The Tribe's conversion claim arises from this transaction (or set of transactions). Second, the Tribe's complaint describes API's raid on the casino and the government offices, leading to the claim for trespass to land, trespass to chattels, and conversion of tribal trade secrets.

*Id.* at 939.

### 1.   *Trespass and trade secret claims*

With respect to the Tribe's trespass and trade secret claims, the Eighth Circuit upheld this court's application of the second *Montana* exception:

> We conclude that because API's forceful intervention on October 1, 2003 threatened the political integrity, the economic security, [and] the health [and] welfare of the Tribe, as well as its rights as a landowner, the tribal courts may exercise jurisdiction over the claims that arise out of that conduct. The Tribe's claims for trespass to tribal land and chattels and conversion of tribal trade secrets grow out of this

8

sovereign authority.

*Id.* at 940 (alteration in original) (internal quotation marks and citations omitted).

The Eighth Circuit reasoned that API's conduct, which amounted to an "attempted coup d'etat," *id.* at 939 n.6, "was a direct attack on the heart of tribal sovereignty, the right of Indians 'to protect tribal self-government.'" *Id.* at 939 (quoting *Montana*, 450 U.S. at 564). The Eighth Circuit also noted that the Tribe's trespass and trade secret claims sought to regulate API's entry and conduct on tribal trust land, and a tribe's "civil authority is at its zenith when the tribe seeks to enforce regulations stemming from its traditional powers as a landowner." *Id.* at 940 (citing *Hicks*, 533 U.S. at 370).

### 2.   *Conversion claim*

The Eighth Circuit concluded that the Tribe's conversion claim is "materially different" from the other torts. *Id.*

> The conversion claim does not appear to arise directly out of what occurred during the October 1 raid. It arises from the payment of tribal funds to API under its contract with Walker. According to the tribal trial court's factual findings, all of the money the Tribe now seeks to recover had been paid to API by September 30, the day before the raid occurred.

*Id.* The Eighth Circuit noted, "[i]t is of course possible that API was paid in advance for planning and executing the raid, but that has not been alleged." *Id.*

### a.   *Second* **Montana** *exception*

The Eighth Circuit held that the Tribe "failed to carry its burden of establishing adjudicatory jurisdiction over the conversion claim under the second *Montana* exception." *Id.* at 941. In reaching this holding, the Eighth Circuit observed that the conversion claim does not seek to regulate conduct on the Tribe's Settlement. Because *Montana* permits tribal regulation of nonmember conduct inside the reservation, "the Tribe must show that the conduct it seeks to regulate occurred within the Meskwaki Settlement." *Id.* at 940. The Tribe's conversion claim, the Eighth Circuit explained, seeks to regulate "API's

unauthorized receipt and retention of tribal funds." *Id.* Because the Tribe did not allege that the receipt or retention of funds occurred on the reservation, the Eighth Circuit could not conclude "that the conduct most directly regulated by the conversion claim occurred on tribal land." *Id.* at 940-41.

The Eighth Circuit also concluded that the Tribe failed to "adequately delineate[] an indirect relationship between the conversion claim as a whole and API's conduct on tribal land, for it remains unclear what portion of the allegedly converted funds may relate to the October 1 raid, as opposed to other services API might have performed under the contract with Walker." *Id.* at 941. Because it could not determine what the funds paid for, the Eighth Circuit concluded it was unable to "examine what conduct by API the conversion claim seeks to regulate." *Id.* Even if some of the funds related to the October 1 raid, the Eighth Circuit stated this "is not enough to sustain jurisdiction over the claim as a whole, for 'when it comes to tribal regulatory authority, it is not in for a penny, in for a Pound.'" *Id.* (quoting *Plains Commerce Bank*, 554 U.S. at 338) (internal quotation marks omitted). In sum, the Eighth Circuit concluded that "the Tribe has failed to carry its burden of establishing adjudicatory jurisdiction over the conversion claim under the second *Montana* exception." *Id.*

### b.    First **Montana** *exception*

The Eighth Circuit noted that "[t]he question remains, however, whether the first *Montana* exception could provide tribal court jurisdiction over the conversion claim." *Id.* Although the contract between Walker and API was not binding on the Tribe, the Eighth Circuit observed that this was not determinative:

> Whether the contract between API and Walker was binding on the Tribe is an issue separate from the question of whether the contract could establish tribal court jurisdiction over the Tribe's claims, for the consensual relationship contemplated by the first *Montana* exception may be with the Tribe itself "or its members." *Montana*, 450 U.S. at 565. Even if the contract

10

> did not bind the Tribe, the operative question for jurisdictional
> purposes is whether the conversion claim has a sufficient nexus
> to the consensual relationship between Walker and API.
> *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001);
> *see Nord v. Kelly*, 520 F.3d 848, 856 (8th Cir. 2008).

*Id.* Declining to answer this question without analysis by the district court, the Eighth Circuit concluded "a remand is necessary so that the district court may consider the applicability of the first *Montana* exception to the Tribe's conversion claim." *Id.*

## V.  PARTIES' ARGUMENTS

The Tribe argues that a sufficient nexus exists between its conversion claim and API's consensual relationship with Walker to support Tribal Court jurisdiction under the first *Montana* exception.  According to the Tribe, the requisite nexus is present if, based upon API's consensual relationship with Walker, API engaged in conduct that the Tribe had authority to regulate.  Because the Tribe has the sovereign authority, expressed in its Constitution, to determine how tribal funds are spent, the Tribe insists it has the authority to regulate API's conduct in converting the Tribe's funds.

API raises a number of arguments in response.  First, API contends that the Tribal Court lacks jurisdiction because the conduct the conversion claim seeks to regulate did not occur on the Tribe's Settlement.  Second, API argues that the first *Montana* exception does not authorize tribal jurisdiction over all nonmember business activities within a reservation.  Third, API asserts that the conduct the conversion claim seeks to regulate has no nexus with API's consensual relationship with Walker.  Fourth, API insists that the Tribal Court's views on the first *Montana* exception are conclusive and cannot be disturbed by this court.  Finally, API argues that it has not consented to Tribal Court jurisdiction, as evidenced by the inclusion of an arbitration clause in its contract with Walker.

## VI.  ANALYSIS

API questions the court's authority to address the issue presented on remand.  According to API, this court cannot disturb the Tribal Court of Appeals' view that the first

11

*Montana* exception does not apply. The court addresses this contention first, before turning to the remaining issues.

### A. Tribal Court of Appeals' Views on First Montana Exception

The Tribal Court of Appeals opined that the first *Montana* exception did not apply:

> The first *Montana* exception is where there is a "consensual relationship" between a tribe and a nonmember, including "commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565. This does not apply to the Tribe's tort claims—as API correctly points out, these are premised on *lack* of consent and turn on the Tribe's claim that there was no valid Contract.

API Appendix ("API App'x") (docket no. 118-3) at 49. API argues that this ruling is "conclusive" and this court "cannot and should not disturb the Tribal Court of Appeals['] decision to refuse jurisdiction under the first *Montana* exception." Brief in Support of API's Resistance ("API Resistance Br.") (docket no. 117-1) at 17-18. In API's view, while a federal court may decide whether a tribe has *exceeded* its jurisdiction, it has no authority to force jurisdiction upon an unwilling tribal court.

There are several problems with API's position. First of all, the Tribal Court of Appeals' statement regarding the first exception is dicta. Because the Tribal Court of Appeals ultimately upheld jurisdiction under the second *Montana* exception, its statements about the first exception were unnecessary to its decision. Second, the Tribal Court of Appeals' statement is not as broad as API suggests. The Tribal Court of Appeals focused on the fact that *the Tribe* did not have a consensual relationship with API, but apparently did not consider the possibility that jurisdiction could be based upon a consensual relationship between API and *a member* of the Tribe. *See* API App'x at 49 (considering whether "there is a 'consensual relationship' between *a tribe* and a nonmember") (emphasis added)). As should now be clear, "the consensual relationship contemplated by the first *Montana* exception may be with the Tribe itself 'or its members.'" *API*, 609 F.3d

at 941 (quoting *Montana*, 450 U.S. at 565). Because the Tribal Court of Appeals did not consider this point, the court will not afford any preclusive effect to this dicta.

API's position suffers from a more fundamental flaw: it is completely at odds with the purpose of the Eighth Circuit's remand. The Eighth Circuit directed this court to do exactly what API claims is forbidden—it remanded this matter "so that the district court may consider the applicability of the first *Montana* exception to the Tribe's conversion claim." *Id.* More importantly, the Eighth Circuit did so only *after* acknowledging the Tribal Court of Appeals' view "that the first exception did not apply." *Id.* Given the Eighth Circuit's remand, as well as its awareness of the Tribal Court of Appeals' view on the matter, the court will not ignore the very purpose of the remand. Accordingly, the court rejects API's argument that the court cannot consider the applicability of the first *Montana* exception to the Tribe's conversion claim.

### B. Jurisdiction Under the First Montana Exception

"The starting point for the jurisdictional analysis is to examine the specific conduct the Tribe's legal claims would seek to regulate. The *Montana* exceptions focus on 'the *activities* of nonmembers' or 'the *conduct* of non-Indians.'" *Id.* at 937 (quoting *Plains Commerce Bank*, 554 U.S. at 330) (internal quotation marks omitted). Here, the Tribe's conversion claim seeks to regulate "API's unauthorized receipt and retention of tribal funds." *Id.* at 940.

> In analyzing the jurisdictional issue we rely on the record developed in the tribal courts and the allegations in the Tribe's complaint. Questions of subject matter jurisdiction often require resolution of factual issues before the court may proceed, *see, e.g.*, *Osborn v. United States*, 918 F.2d 724, 728-30 (8th Cir. 1990), and that is particularly true of inquiries into tribal jurisdiction. It is therefore both necessary and appropriate for the parties and the tribal court to ensure that "a full record [is] developed in the Tribal Court." *Nat'l Farmers Union*, 471 U.S. at 856. Here, the parties were afforded discovery in the tribal court. API has not contested

13

any of the material allegations made by the Tribe, and we
therefore take them as true for present purposes.

*Id.* at 937.

The first *Montana* exception "recognizes tribal power to regulate nonmembers when
they 'enter consensual relationships with the tribe or its members.'" *Id.* at 941 (quoting
*Montana*, 450 U.S. at 565). If such a consensual relationship exists, "the operative
question for jurisdictional purposes is whether the conversion claim has a sufficient nexus
to the consensual relationship." *Id.*

The Eighth Circuit already decided that API had a consensual relationship with Alex
Walker, Jr., a tribal member. *See id.* ("[T]he operative question for jurisdictional
purposes is whether the conversion claim has a sufficient nexus to *the consensual
relationship* between Walker and API." (emphasis added)). Even without this guidance,
the consensual relationship requirement is plainly met in this case, where API entered into
a services contract with a tribal member. *See Montana*, 450 U.S. at 565 (describing
"consensual relationships" with a tribe or its members as "commercial dealing, contracts,
leases, or other arrangements"); *see also Hicks*, 533 U.S. at 359 n.3 ("Read in context,
an 'other arrangement' is clearly another *private consensual* relationship . . . ."").
Accordingly, the remaining issue is whether the Tribe's conversion claim has a sufficient
nexus to API's consensual relationship with Walker.

### C.  Location of API's Conduct

Before addressing whether the requisite nexus is present, API argues that the first
*Montana* exception does not apply because the Tribe offers no proof that the conduct
underlying the conversion claim occurred on the Tribe's Settlement. According to API,
this is a "*necessary* condition" for Tribal Court jurisdiction and it is "essential" that "the
Tribe prove that the activities that the conversion claim seeks to regulate occurred on the
Meskwaki Settlement." API Resistance Br. at 8-9; *see also* Brief in Support of API's
Motion ("API Br.") (docket no. 118-1) at 7-8 (stating same). Although it faults API for

raising the issue at this point, the Tribe concedes that this is a prerequisite for Tribal Court jurisdiction under the first *Montana* exception.  *See* Tribe's Resistance & Reply at 5-6 (arguing that the Tribe made a sufficient showing that API's conversion occurred on the Settlement).

Despite the parties' apparent agreement on this issue, the court deems it appropriate for further discussion.  Accordingly, the court first considers whether this is, in fact, a "necessary" and "essential" condition for Tribal Court jurisdiction.  If it is, the court will decide whether it is met in this case.

### 1.     *Land status*

The Supreme Court has frequently considered land status when assessing tribal jurisdiction over nonmembers.  The usual distinction, however, has been between reservation land owned by or held in trust for a tribe or its members, sometimes called "trust land," and so-called "non-Indian fee lands," that is, land within a reservation that has been "acquired in fee simple by non-Indian owners."  *Strate*, 520 U.S. at 446.  While *Montana's* general rule—that tribes lack civil jurisdiction over nonmembers—"applies to both Indian and non-Indian land," *Hicks*, 533 U.S. at 360, a tribe is more likely to have civil jurisdiction over nonmember conduct on Indian land.  *See id.* (noting that land status "may sometimes be a dispositive factor" and "the absence of tribal ownership has been virtually conclusive of the absence of tribal civil jurisdiction"); *Strate*, 520 U.S. at 454 ("[T]ribes retain considerable control over nonmember conduct on tribal land.").

The distinction between Indian land and non-Indian fee land within a reservation, at least for jurisdictional purposes, appears to be waning.  In *Hicks*, for example, the Court stated that "[t]he ownership status of land . . . is only one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.'"  *Hicks*, 533 U.S. at 360 (quoting *Montana*, 450 U.S. at 564).  The Court has since reiterated this point, stating that "[t]he status of the

land is relevant 'insofar as it bears on the application of . . . *Montana's* exceptions to [this] case." *Plains Commerce Bank*, 554 U.S. at 331 (quoting *Hicks*, 533 U.S. at 376 (Souter, J., concurring)); *see also Hicks*, 533 U.S. at 387 (O'Connor, J., concurring) ("Today, the court finally resolves that *Montana v. United States* governs a tribe's civil jurisdiction over nonmembers regardless of land ownership." (citation omitted)); *Atkinson*, 532 U.S. at 660 (Souter, J., concurring) (stating that *Montana's* general rule is "the first principle, regardless of whether the land at issue is fee land, or land owned by or held in trust for an Indian tribe.").

Despite the oft-invoked distinction between Indian land and non-Indian fee land within a reservation, this is not the precise distinction at issue here.  Neither side suggests that any non-Indian fee lands were involved in the events giving rise to the Tribe's conversion claim.  Rather, API argues that the Tribe has failed to prove that API's conduct underlying the conversion claim—the unauthorized receipt and retention of tribal funds—occurred on the Tribe's reservation at all, ignoring any distinction between Indian land and non-Indian fee land within the Settlement.  Because the Tribe has failed to satisfy "this *necessary* condition for [T]ribal [C]ourt jurisdiction," API argues it is entitled to summary judgment.  API Resistance Br. at 9.

The Eighth Circuit discussed the issue of land status with respect to the Tribe's conversion claim, stating:

> In order to establish jurisdiction over the conversion claim under the second *Montana* exception, the Tribe must show that the conduct it seeks to regulate occurred within the Meskwaki Settlement, for "*Montana* and its progeny permit tribal regulation of nonmember *conduct inside* the reservation." *Plains Commerce Bank*, 554 U.S. at 332 (second emphasis added).  The conduct the conversion claim seeks to regulate most directly is API's unauthorized receipt and retention of tribal funds.  The Tribe makes no allegation that the receipt or retention of the funds occurred within the Meskwaki Settlement, however, so we cannot conclude that the conduct

16

> most directly regulated by the conversion claim occurred on
> tribal land.

*API*, 609 F.3d at 940-41 (citations omitted).

In making its "on the Settlement" argument, API relies heavily on this passage of the Eighth Circuit's opinion. However, this reliance may be misplaced. First of all, the above discussion was, by its terms, limited to "jurisdiction over the conversion claim under the *second Montana* exception," *id.* at 940 (emphasis added), which is not before the court. More perplexing, however, is that after acknowledging the complete absence of any allegation by the Tribe that the conversion occurred on the Settlement, the Eighth Circuit declared, "[t]he question remains, however, whether the first *Montana* exception could provide tribal court jurisdiction over the conversion claim." *Id.* at 941. Thus, the Eighth Circuit appeared to imply that tribal jurisdiction over the conversion claim could exist under the first *Montana* exception *despite the fact* that the conduct it seeks to regulate did not occur on the Settlement.

The question, then, is whether tribal jurisdiction may exist under the first *Montana* exception even if the conduct at issue occurred outside the reservation. The simple answer appears to be no. In *Hornell Brewing Co. v. Rosebud Sioux Tribal Court*, 133 F.3d 1087, 1089 (8th Cir. 1998), Crazy Horse's estate sued several breweries in tribal court over the use of the Crazy Horse name in connection with a malt liquor beverage. The Eighth Circuit began by stressing that tribal jurisdiction extends only to nonmember activities on the reservation:

> Indian tribes . . . "retain inherent sovereign power to exercise
> some forms of civil jurisdiction over non-Indians *on their*
> *reservations*." *Montana*, 450 U.S. at 565 (emphasis added).
> The operative phrase is "on their reservations." Neither
> *Montana* nor its progeny purports to allow Indian tribes to
> exercise civil jurisdiction over the activities or conduct of non-
> Indians occurring *outside their reservations*.

*Id.* at 1091.

17

The *Hornel Brewing* court went on to note that the nonmember activities at issue—the manufacture, sale and distribution of malt liquor—did not occur on the tribe's reservation. *Id.* Furthermore, the parties "fail[ed] to cite a case in which the adjudicatory power of the tribal court vested over activity outside the confines of a reservation." *Id.* The Eighth Circuit ultimately held that the tribal court lacked jurisdiction, stating it was "plain that the [defendants'] conduct outside the Rosebud Sioux Reservation does not fall within the Tribe's inherent sovereign authority."[5] *Id.* at 1093.

As one court observed, *Hornell Brewing* "clearly held that tribal jurisdiction does not extend to . . . off reservation activities." *Christian Children's Fund, Inc. v. Crow Creek Sioux Tribal Court*, 103 F. Supp. 2d 1161, 1166 (D.S.D. 2000). Accordingly, tribal jurisdiction is lacking where the nonmember conduct at issue did not occur on the tribe's reservation. *See Yankton Sioux Tribe Head Start Concerned Parents v. Longview Farms, LLP*, No. CIV. 08-4058, 2009 WL 891866, at *3 (D.S.D. Mar. 31, 2009) ("The Tribe does not have regulatory authority over the construction of the farrowing facility by Defendant, a non-Indian entity, because such facility is located on land which is not within reservation boundaries."); *Progressive Specialty Ins. Co. v. Burnette*, 489 F. Supp. 2d 955, 958 (D.S.D. 2007) ("Indian tribes are not permitted to exercise jurisdiction over the activities or conduct of non-Indians occurring outside the reservation.").

Supreme Court precedent also suggests that conduct on the reservation—whether it be tribal trust land or non-Indian fee land within the reservation—is a *sine qua non* to tribal jurisdiction over nonmembers, regardless of which *Montana* exception is invoked. In

---

[5] *Hornell Brewing* involved a claim of tribal jurisdiction under the second *Montana* exception, not the consensual relationship exception involved here. *See Hornell Brewing*, 133 F.3d at 1093. However, *Hornell Brewing* did not confine its discussion of jurisdictional principles to the second *Montana* exception. *See id.* at 1091 ("Neither *Montana* nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservations*.").

*Plains Commerce Bank*, the Court stated that "*Montana* and its progeny permit tribal regulation of nonmember *conduct inside the reservation* that implicates the tribe's sovereign interests." 554 U.S. at 332 (second emphasis added); *see also id.* (noting that the cases cited in *Montana* as examples of the first exception "[e]ach involved regulation of non-Indian activities *on the reservation* that had a discernible effect on the tribe or its members" (emphasis added)); *cf. Hicks*, 533 U.S. at 375-76 (Souter, J., concurring) ("[L]and status *within a reservation* is not a primary jurisdictional fact . . . ." (emphasis added)). *Montana* itself supports this requirement, where the Court prefaced the *Montana* exceptions with the statement that "tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians *on their reservations*." 450 U.S. at 565 (emphasis added); *see also Plains Commerce Bank*, 554 U.S. 334 ("[O]ur *Montana* cases have always concerned nonmember conduct on the land."). Thus, the court agrees with API that to sustain tribal jurisdiction over the conversion claim, the conduct the conversion claim seeks to regulate must have occurred within the Tribe's Settlement.

### 2.      *Where the conduct occurred*

"The conduct the [Tribe's] conversion claim seeks to regulate most directly is API's unauthorized receipt and retention of tribal funds." *API*, 609 F.3d at 940. Accordingly, the issue is whether this conduct occurred on the Tribe's Settlement. "[T]he Tribe bears the burden of showing that its assertion of jurisdiction falls within one of the *Montana* exceptions." *Id.* at 936.

To satisfy this burden, the Tribe points to the following allegation in its Tribal Court complaint:

> 1.      [The Tribal Court] has subject matter jurisdiction in this matter . . . and has *personal jurisdiction over* [API] . . . because the cause of this action arose within the jurisdiction of the Tribe, because the Tribe brings this suit to cause [API] to return funds to the Tribe which [API] unlawfully has taken and retained, and because [API] committed torts against the Tribe

19

> and harm to tribal real property and to other tribal property on
> the Settlement.

Tribe App'x at 1.  According to the Tribe, its complaint "alleges API's actions, including converting the Tribe's funds, occurred within the Tribe's jurisdiction."  Brief in Support of Tribe's Motion ("Tribe Br.") (docket no. 112-1) at 11.

The court disagrees with the Tribe that this allegation, standing alone, satisfies its burden.  The Tribal Court complaint was part of the record on appeal, and the Eighth Circuit expressly relied on "the allegations in the Tribe's complaint" in addressing the jurisdictional question.  *API*, 609 F.3d at 937.  The Eighth Circuit also noted that API did not contest any of the Tribe's material allegations.  *Id.*  Nonetheless, the Eighth Circuit concluded that "[t]he Tribe makes no allegation that the receipt or retention of the funds occurred within the Meskwaki Settlement."  *Id.* at 940-41.  In other words, the Eighth Circuit was aware of the Tribe's allegations, but apparently found them insufficient on this issue.  The court is in no position to disturb this conclusion and, therefore, disagrees with the Tribe that its allegations are "established facts."[6]  Tribe's Resistance & Reply at 7.

Aside from the above allegation, the record essentially is devoid of any insight into the location of API's alleged conversion—i.e., unauthorized receipt and retention—of tribal funds.[7]  The Tribe concedes that it "did not make more specific allegations regarding some

---

[6]  The Tribe insists that API did not contest the Tribe's "general allegation" regarding the location of the conversion, and it therefore "remains undisputed."  Tribe's Resistance & Reply at 7 n.5.  The Tribe also argues, without citation to authority, that API "is precluded from raising as an issue on remand whether the conversion occurred on tribal lands.  That issue is not properly before this [c]ourt."  *Id.* at 6.  Again, however, the Eighth Circuit concluded that the Tribe simply "ma[de] no allegation that the receipt or retention of the funds occurred within the Meskwaki Settlement."  *API*, 609 F.3d at 940-41.  It seems immaterial whether API has previously challenged an allegation that was apparently, in the Eighth Circuit's view, insufficient ab initio.

[7]  The conduct at issue here—API's receipt and retention of $1 million in tribal
(continued...)

of the component parts" of where the conversion occurred. *Id.* at 7 n.5. Such "component parts" include, according to the Tribe, whether Walker initiated exchanges of money from his home, another location on the Settlement or whether exchanges with API were fully completed on the Settlement. *Id.* The Tribe explains that it "has not yet obtained discovery from API regarding these component parts" and "API did not seek to litigate any of these component parts." *Id.*

The fact remains, however, that "the Tribe bears the burden of showing that its assertion of jurisdiction falls within one of the *Montana* exceptions." *API*, 609 F.3d at 936. The court must rely on the record developed in the tribal courts; indeed, it is "both necessary and appropriate for the parties and the tribal court to ensure that 'a full record [is] developed in the Tribal Court.'" *Id.* at 937 (alteration in original) (quoting *Nat'l Farmers Union*, 471 U.S. at 856). The court doubts whether this was done here, but the Tribe chose instead to rely on a generalized allegation that failed to convince the Eighth Circuit that API's unauthorized receipt and retention of tribal funds occurred on the Tribe's Settlement. The Tribe offers nothing to alter this conclusion, and the court, therefore, cannot conclude that the conduct the Tribe's conversion claim seeks to regulate most directly, i.e., "API's unauthorized receipt and retention of tribal funds," *id.* at 940, occurred within the Tribe's Settlement.

---

[7](…continued)

funds—is quite different from the nonmember conduct considered in the typical tribal jurisdiction case. The conduct underlying the conversion claim could occur in one exchange or many, at one location or many and could consist even of a simple electronic transaction, making the "location" of such conduct a rather amorphous concept. The leading Supreme Court decisions, by contrast, generally involve nonmember conduct with an obvious or distinct locus. *See Hicks*, 533 U.S. at 357 (execution of search warrant by state law enforcement on tribal land); *Atkinson*, 532 U.S. at 649 (hotel occupancy tax on nonmember-owned hotel); *Strate*, 520 U.S. at 442 (car accident on public highway through reservation land); *Montana*, 450 U.S. at 557 (nonmember hunting or fishing on non-Indian fee land).

The Tribe posits that "the only significant benefit that API obtained from acting as Walker's mercenary force was access to millions of dollars in tribal funds." Tribe Br. at 4. The Tribe also asserts that the purpose of API's consensual relationship with Walker was API's investigation of Tribal Council members, as well as the planning and execution of the raid on the Tribe's Settlement:

> Through its consensual relationship with Walker, API converted tribal funds in payment for investigations it conducted *on the Settlement* of Tribal Council members, and for planning and executing, *on the Settlement*, a coup d'état against the duly elected governing body of the Tribe.

*Id.*

The Tribe's emphasis on the possibility[8] that the funds went to API in exchange for its actions on the Settlement is misplaced. "The starting point for the jurisdictional analysis is to examine the *specific conduct* the Tribe's legal claims would seek to regulate." *API*, 609 F.3d at 937 (emphasis added). Furthermore, "[e]ach claim must be analyzed individually in terms of the *Montana* principles to determine whether the tribal court has subject matter jurisdiction over it." *Id.* Thus, the focus for jurisdictional purposes must remain on the conduct underlying the conversion claim itself, as opposed to the conduct underlying the Tribe's other claims, which unquestionably did occur on the Tribe's Settlement. *See id.* at 940 ("The Tribe's trespass and trade secret claims thus seek to regulate API's entry and conduct upon tribal land . . . ."). The Tribe offers no evidence that the conduct the conversion claim seeks to regulate occurred on the Settlement. Although the Tribe presumes that the funds were paid in exchange for the raid, it *still* "remains unclear what portion of the allegedly converted funds may relate to the October 1 raid, as opposed to other services API might have performed under the contract with

---

[8] *See API*, 609 F.3d at 940 ("It is of course possible that API was paid in advance for planning and executing the raid, but that has not been alleged.").

22

Walker." *Id.* at 941. The Tribe has failed to illuminate this issue any further.

The Tribe also relies on its allegation in the Tribal Court complaint that "the actual harm from API's activities occurred on tribal land." Tribe's Resistance & Reply at 6. However, this obscures the issue, as "[t]he *Montana* exceptions focus on 'the *activities* of nonmembers' or 'the *conduct* of non-Indians.'" *API*, 609 F.3d at 937 (quoting *Plains Commerce Bank*, 554 U.S. at 330 (internal quotation marks omitted)). As such, the jurisdictional inquiry focuses not on where the harm was suffered, but "examine[s] the specific conduct the Tribe's legal claims would seek to regulate." *API*, 609 F.3d at 937. Allowing tribal jurisdiction any time a tribe or tribal member suffered harm on the reservation could run afoul of the Supreme Court's admonition that the *Montana* exceptions not "be construed in a manner that would 'swallow the rule' or 'severely shrink' it." *Plains Commerce Bank*, 554 U.S. at 330 (citations omitted).

### 3.    *Summary*

"*Montana* and its progeny permit tribal regulation of nonmember *conduct inside the reservation* that implicates the tribe's sovereign interests." *Plains Commerce Bank*, 554 U.S. at 332 (second emphasis added). Stated conversely, "[n]either *Montana* nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservations*." *Hornell Brewing*, 133 F.3d at 1091.

The Tribe's conversion claim seeks to regulate API's "unauthorized receipt and retention of tribal funds." *API*, 609 F.3d at 940. As the Eighth Circuit noted, the Tribe made no allegation that this conduct occurred within the Meskwaki Settlement. *Id.* On remand, the Tribe offers nothing to alter this analysis or allow the court to conclude that API's conduct underlying the conversion claim occurred on the Tribe's reservation. Thus, the Tribe has failed to satisfy a necessary condition for tribal jurisdiction over a nonmember and, therefore, failed to carry its burden of establishing adjudicatory

jurisdiction over the conversion claim under the first *Montana* exception.

## D. Tribe's Alternative Request

In the event the court concluded the Tribal Court lacks jurisdiction over the Tribe's conversion claim, the Tribe asks the court to "enter judgment against API for $1,022,171.26 plus interest." Tribe's Motion at ¶ 2. API contends this request is "baseless," pointing out that the Tribe has not filed a conversion claim or counterclaim against API in this court. API Resistance Br. at 2. API also notes that the Tribal Court's factual findings for jurisdictional purposes "plainly do not constitute a determination of *the merits* of the Tribe's conversion claim." *Id.*

The court agrees with API. The Tribe has not a filed a claim in this court, and the parties have not litigated the merits of the Tribe's conversion claim. Further, the proceedings in the Tribal Court were limited to the issue of jurisdiction. *See* Tribe App'x at 115 ("The Tribe's ability to actually recover from API on its underlying claims, which have yet to be decided by the Tribal Court, depends upon whether the Tribal Court has jurisdiction over API."). Accordingly, the court shall deny the Tribe's Motion to the extent it asks the court to enter judgment against API on the conversion claim.

## VII. CONCLUSION

The court concludes that the Tribal Court may not exercise jurisdiction over the Tribe's claim against API for conversion of tribal funds. Accordingly, the Tribe's Motion (docket no. 112) is **DENIED** and API's Motion (docket no. 118) is **GRANTED**. The Clerk of Court is directed to enter judgment in API's favor on Count I of the Complaint (docket no. 2) insofar as it seeks a declaration that the Court of the Sac & Fox Tribe of the Mississippi in Iowa lacks jurisdiction over the Tribe's conversion claim. The Clerk of Court is further directed to close this case.

**IT IS SO ORDERED.**

**DATED** this 18th day of August, 2011.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA